ERVIN J. STONE and VIVIAN M. STONE, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Stone v. Commissioner
Docket No. 5805-70.
United States Tax Court
T.C. Memo 1973-26; 1973 Tax Ct. Memo LEXIS 262; 32 T.C.M. (CCH) 94; T.C.M. (RIA) 73026; February 5, 1973, Filed *262 Held: Petitioners did not sell their land under threat or imminence of condemnation and they are not entitled to defer any part of the gain from the sale under section 1033. Robert M Chandler, Jr., and Jeff D. Batts, for the petitioners. Frank D. Armstrong, Jr., for the respondent. IRWIN
MEMORANDUM FINDINGS OF FACT AND OPINION
IRWIN, Judge: Respondent determined a deficiency of $9,547.37 in petitioners' income tax for 1967. The single issue that we are to decide is whether petitioners sold certain land under the threat or imminence of condemnation in order to entitle them to defer recognition of part of the 2 gain under section 1033. [1] Petitioners have conceded that $10,800 of the gain must be recognized by reason of their failure to reinvest that amount of the sale proceeds within the period specified *263 in section 1033. FINDINGS OF FACT Some of the facts have been stipulated and they are so found. The exhibits attached to the stipulation are incorporated herein by this reference. Petitioners are Ervin J. and Vivian M. Stone, husband and wife, who at all relevant times lived in Wilson, N.C., and who for 1967 filed a joint income tax return with the district director of internal revenue, Greensboro, N.C. Hereafter, Ervin J. Stone shall be referred to as petitioner. Petitioner is a farmer and in 1967 he owned or managed several farms in the vicinity of Rocky Mount, N.C. Among the properties owned by petitioner in 1967 was a tract of about 56 acres located on Edgewater Road in Stony Creek Township, Nash County, N.C. Petitioner had discontinued his farming operations on and near this tract prior to 1967 and had begun to sell plots of land for recreational and residential purposes. Petitioner planned to sell all of his land in the Edgewater Road tract for such purposes over a period of years. In 1967 petitioner had not begun to improve the land 3 with roads or sewers, and he had *264 not formally subdivided the tract for further sales. On April 23, 1966, the County Commissioners, Nash County, N.C., approved a bond issue of $5,500,000 to raise funds for the construction of a new hospital to be located in Nash County, N.C. The new hospital was to be partially funded by Federal funds made available through the Hill-Burton Act. On April 24, 1966, the Nash County Commissioners passed a resolution creating a board of trustees (hereafter trustees) for the proposed Nash County General Hospital which conferred upon the trustees power to engage in the planning, establishment, construction, maintenance and operation of a hospital facility in Nash County. The resolution also required that all contracts and obligations entered into by the trustees for the planning, establishment and construction of the hospital and its related facilities to be approved by the Nash County Commissioners. The resolution authorized the trustees to call upon the commissioners to acquire by eminent domain any property, including improvements and fixtures thereon, which the trustees deemed necessary or advisable to acquire for hospital purposes. On July 8, 1966, the trustees met to elect *265 officers. The following officers were nominated and elected for a term expiring December 1, 1967: 4 George B. Watson
Chairman (hereafter Watson)
Archie McLean
Vice Chairman
Frank P. Meadows, Jr.
Secretary
The trustees acted as a committee as a whole in selecting a site for the new hospital. The selection of a site for the hospital required formal ratification by the trustees. The trustees had the right to recommend a hospital site but the final selection of the site was to be made by the commissioners. After examining available locations the trustees tentatively selected a site which included petitioner's Edgewater Road tract (site 1). Negotiations were conducted with petitioner and the other owners of site 1, and in November 1966 the trustees publicly announced their choice of site 1 for the hospital. Prior to the negotiations with the trustees petitioner had listed his property for sale with M. P. Dawson (hereafter Dawson) of Dawson Realty Company, Rocky Mount, N.C. Dawson represented all of the landowners in site 1. Petitioner voluntarily entered into a contract through Dawson to sell his land to Nash County for $1,632 per acre in November *266 1966. Petitioner further agreed to remove graves from his land at the instance of the County. Removal of the graves cost petitioner $2,500. In February 1967 the trustees discovered that an owner of land adjoining site 1 had leased his land to a third 5 party for rock quarrying. The trustees felt that the existence of a quarry next to site 1 was inconsistent with the site's use for a hospital. When the trustees were unable to buy the quarry lease for what they considered to be a reasonable price, they began investigating other sites. In order to encourage the trustees to continue to plan to build the hospital on site 1, a drive was organized to obtain $80,000 in pledges to purchase the land containing the quarry. Petitioner pledged between $15,000 and $20,000 toward purchasing the quarry property. Although an option was obtained to purchase the quarry property for $80,000, the trustees refused to reconsider site 1 at that time. By the beginning of 1967 the trustees had second thoughts about the advisability of locating the hospital on site 1 because it was not in the geographical center of Nash County. After the quarry problem was discovered with respect to site 1, *267 the trustees began considering a second site at Red Oak Road and Highway 64 bypass about 8.5 miles west of Rocky Mount, N.C. (site 2). Site 2 was subsequently rejected by the trustees because of difficulties and expenses in bringing utilities to site 2 and because many of the medical personnel who might be expected to work at the hospital believed that this site was too far from Rocky Mount. 6 The trustees then considered another site located approximately 1.5 miles west of Rocky Mount in the southeast quadrant of the intersection of Halifax Road and old Highway 64 (site 3). On July 6, 1967, the trustees reached a unanimous decision approving site 3 as the location for the hospital. After approving site 3 as the location for the hospital the trustees sent letters to all of the landowners in site 3 expressing their desire to acquire their properties for the hospital. The major landowner in site 3, Mrs. Baker, objected strenuously to the proposed taking of her land. She did not wish to move from her land and was convinced that the County would not pay her her price to acquire the property. Mrs. Baker retained legal counsel to represent her in negotiating with the County. *268 Many of the smaller landowners in site 3 were negroes who felt that the taking of their homes discriminated against them. A civil rights organization came to the aid of these homeowners to protect their interests in the negotiations with the County. By the end of the summer it became apparent to the trustees that they would have to consider locations for the hospital other than site 3. The opposition of the landowners, the propsect of a court fight over condemning the land, and the possibility that site 3 might cost more than 7 the amount that had been allocated toward the purchase of land militated against the feasibility of site 3. The trustees had set a deadline of November 1, 1967, for concluding all phases of acquiring land for the hospital because they felt that the project might lose its Federal funding if the land was not acquired by that time. Notwithstanding the difficulties with respect to acquiring site 3 by November 1, 1967, the trustees attempted to negotiate with the owners of that site through the end of September 1967. During the period that the trustees were considering sites for the proposed hospital local newspapers carried many stories concerning *269 the progress of the land acquisition and the problems that were arising. In particular, the newspapers noted the controversies among members of the community over the trustees' choice of particular sites for the hospital, the difficulties that had developed with respect to the acquisition of site 3, the fact that a site could be condemned if necessary, and the possible loss of Federal funding which would occur if a site was not secured by November 1, 1967. Petitioner was generally aware of the developments with respect to the hospital site through reading newspapers and through his contacts with members of the community. In early September 1967 petitioner received a phone call from Watson who requested that petitioner come to his office quickly. Watson had always favored site 1 as the location 8 for the new hospital and desired to find out from petitioner whether his part, the largest part, of site 1 would still be available if the trustees' attempts to secure site 3 were discontinued. Watson and the other trustees at no time intended to ask the County Commissioners to condemn petitioner's land for the hospital project because condemnation proceedings could not be completed *270 in time to meet the deadline for acquiring a site. Petitioner went to Watson's office to discuss selling his Edgewater Road land to the County. During the course of their conversation Watson reviewed with petitioner the nature and history of the hospital project and stated that he hoped that petitioner would be willing to sell his land as a favor to the community. Watson did explain to petitioner that the County had the right to condemn his land, if need be; but he did not state that the County would condemn petitioner's land if petitioner would not cooperate. Petitioner indicated that he would be willing to sell his land to the County provided that the County did not try to bargain him down from the price that he was willing to take when site 1 was originally considered. Petitioner also indicated that he did not want the County to send appraisers to look at his land. At the request of Watson petitioner did not reveal to anyone except Dawson the tenor of his conversation with Watson. 9 On September 7, 1967, petitioner gave Dawson a new option to list his property for sale at $1,632 per acre. Petitioner relisted his property with Dawson after his meeting with Watson because *271 he felt that he was under a moral obligation to sell his land through Dawson. Petitioner did not indicate to Dawson that his property might be condemned. As before, Dawson also had listing contracts with the other owners of site 1. After proper action was taken by the trustees and the County Commissioners, petitioner sold his part of site 1 to the County on October 5, 1967. In all, petitioner sold 56.581 acres of land at $1,632 per acre. OPINION Section 1033 permits a taxpyaer to defer the gain from the sale of property if such property is sold as a result of the threat or imminence of condemnation and if the proceeds of the sale are reinvested in the manner required by statute. Petitioner claims that he is entitled to defer under section 1033 the gain realized in 1967 from the sale of land to Nash County because the sale was made under threat or imminence of condemnation. Respondent contends that the sale to the County was voluntarily made as the result of arm's-length bargaining and does not come within the ambit of the statute. We agree with respondent. 10 We note that at no time did the trustees ever consider having petitioner's land condemned; consequently, petitioner *272 could not have sold his land under the imminence of condemnation. On the other hand, the existence of a threat of condemnation is to be judged from the seller's point of view by taking into account all of the facts and circumstances known to the seller at the time of the sale. , appeal pending C.A. 7, December 30, 1971; . The test to be employed is whether the seller reasonably believed that something undesirable would happen if he refused to sell his land. . Both parties have provided us with a wide array of clippings from newspapers which appeared in the area of Nash County while the trustees were trying to locate a site for the proposed hospital. These clippings do indicate that by September 1967 the trustees were desperate to find an acceptable site by November 1967; however, absent from these clippings is any statement that the County intended to acquire site 1 by condemnation. Petitioner's claim that he believed that his property was threatened by condemnation in September 1967 is based primarily upon two facts: (1) that the *273 County needed land for the hospital in a hurry; and (2) that he knew that the County could condemn, if need be. We do not think that a 11 threat of condemnation can be inferred reasonably from these two facts alone, particularly in light of other facts in the record. First there is no evidence other than petitioner's testimony that the trustees or any official of the County actually threatened either orally or in writing to condemn petitioner's land if he did not sell. Watson described his conservation with petitioner in early September 1967 as exploratory and denied that he threatened to seek condemnation, although he did mention that the County had the power to condemn. Second, the County backed away from a confrontation over condemnation with owners of site 3 and began looking for alternative sites. Third, it should have been clear to petitioner that the County could not have completed the acquisition of his land in less than two months if he opposed its taking. On the record we see petitioner not as the object of governmental coercion but as a person who seized upon the time predicament of the County to enter into a sale that was advantageous to him and which he desired *274 to consummate. In November 1966 petitioner voluntarily agreed to sell his land to the County for $1,632 per acre. To help consummate the sale petitioner went so far as to pledge a large amount of money toward the purchase of a nearby quarry lease in order to remove all impediments to the sale. To say the least, petitioner was 12 anxious to sell the land to the County. Petitioner claims that his attitude toward the sale changed in the ten months that intervened between the first sale agreement and the reopening of negotiations with the County. We fail to see any evidence of a change of heart by petitioner; he made no improvements upon his land in site 1 in the interim and he did not attempt to sell any more lots. At the conference with Watson in September 1967 petitioner warned Watson that he would not sell his land if the trustees tried to bargain down the price of the land from the $1,632 per acre which had been agreed upon in the prior year. Such a warning indicates to us that petitioner knew that he had the upper hand in the bargaining with the County and that he did not take the County's condemnation powers seriously. In view of the foregoing we hold that petitioner *275 did not sell his property to Nash County on October 5, 1967, as a result of the threat or imminence of condemnation and that he is not entitled to defer any part of the gain realized in the sale under section 1033. Decision will be entered under Rule 50. Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, as amended. ↩